UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PRISON LEGAL NEWS, a project of the HUMAN RIGHTS DEFENSE CENTER, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-6862 |
| v. | ) ) | Judge Joan B. Gottschall |
| COUNTY OF COOK, ILLINOIS, et al., | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff operates a not-for-profit organization called the Human Rights Defense Center and publishes both a monthly journal called *Prison Legal News* and an informational handbook called *Prisoners' Guerilla Handbook to Correspondence Programs in the United States & Canada* ("*Prisoners' Handbook*"). Defendants are County of Cook, Illinois, which operates the Cook County Jail ("CCJ"); Thomas Dart, the Sheriff of Illinois; and Nneka Jones Tapia, the executive director of CCJ. Plaintiff claims that it sent approximately 112 issues of *Prison Legal News* and at least 12 copies of *Prisoners' Handbook* to CCJ since March 2015, only to have them improperly "censored" by defendants. Before the court is plaintiff's motion for a preliminary injunction [6]. Plaintiff seeks a declaration that defendants' mailroom policies and practices at CCJ violate its First Amendment, due process and equal protection rights under the United States Constitution, and requests that defendants be enjoined from applying CCJ's mailroom policies and practices in an unconstitutional manner.

## I. Background

Plaintiff publishes and distributes a monthly journal, *Prison Legal News*, which contains correctional facility, criminal justice, and legal news affecting prisoners. This publication, along with plaintiff's softcover book, *Prisoner's Handbook*, is distributed to some 2,600 correctional facilities around the country—although CCJ is not one of them. CCJ has adopted a mailroom policy, General Order No. 14.10 (effective July 27, 2007), which provides that "[n]o inmate is permitted to receive subscriptions to magazines or periodical publications" unless they are sent directly to the inmate by a "person" not in custody.[1] Pl.'s Reply, Dkt. 35, Exh. A, ¶ III(L); Exh. B, (II)(1). Paperback books are permitted, up to three per mailing, but may be rejected "due to legitimate security concerns or inappropriate content," in which case the inmate will be notified by means of a "Notice of Mail Return" receipt. *Id.* The general order also provides that incoming "correspondence" may be rejected for a number of reasons, including when the item contains "information regarding the manufacture of explosives, weapons, or drugs," "threats or details of criminal activity," or has "content intended to assist in disrupting the orderly operation of" CCJ. *Id.*, ¶ III(H). Returned mail and packages will be stamped "return to sender" and an entry will be made in the "Mail Return" logbook. *Id.*

General Order 14.10 was amended on October 9, 2015 by means of a General Order bearing the number 24.14.10.0 Ch. 1. Dkt. 35, Exh. B. This updated general order allowed inmates to "have access to daily editions of newspapers in divisional recreation rooms and/or divisional law libraries." *Id.*, Exh. A, ¶ II (5). However, *Prison Legal News* is not one of the permitted newspapers; in fact, only *USA Today* is made available to detainees in common areas and law libraries. The updated 2015 general order also did not alter the inability of prisoners to receive subscriptions or periodicals directly from publishers. This restriction remains in place.

---

[1] "Person" appears to exclude publishers.

CCJ instituted another mail room policy change in September 2016 that purportedly made *Prison Legal News* available to inmates in common areas and/or the law libraries, or possibly by subscription. The parties disagree as to the scope and effect of this mailroom policy change: the policy change has not been reduced to paper or formalized in any fashion, but instead was instituted via oral directive. Further, as will be discussed below, defendants themselves seem to be unclear about the exact nature of the oral policy change. At the very least, they have not made its nature clear to the court.

According to plaintiff, CCJ's current mailroom policy means that *Prison Legal News* and *Prisoner's Handbook* are not being delivered to their intended recipients. Plaintiff argues that the censorship of its various publications was done without notification and without an opportunity to appeal, in violation of its Constitutional due process rights.[2] Plaintiff further argues that the CCJ mailroom policy permits an improper censorship of speech in violation of the First Amendment. Finally, plaintiff contends that defendants' policy of selectively allowing newspapers into CCJ's common areas and law libraries is a violation of its right to equal protection of the laws.[3]

Defendants argue that plaintiff's lawsuit is improper because it does not seek to further a basic goal of preliminary injunctions—maintaining the status quo pending a further determination of the parties' rights—but instead "seeks to overturn the status quo and force CCJ

---

[2] Plaintiff does not explain what it means by "censored." Plaintiff repeatedly asserts that it received no notification from defendants regarding defendants' refusal to accept plaintiff's publications, yet somehow plaintiff learned that the documents were not being delivered. Neither party explains the situation. The court is left to infer that defendants notified the affected inmates and then simply threw out plaintiff's materials; however, this might not be accurate.

[3] Plaintiff does not develop this argument in either of its briefs, and the court is therefore unable to evaluate it. The plaintiff also raises a new argument in its reply brief that the court likewise is unwilling to address due to inadequate briefing—that plaintiff has standing to protect the constitutional rights of other publishers whose First Amendment rights also are threatened by defendants' restrictive policies. *See* Dkt. 35, at 5.

to change its policy before a further determination of the parties' rights." Defs.' Resp., Dkt. 25 at 2. Defendants maintain that this case is not about vindicating detainees' right to access of newspapers and books (as detainees at CCJ already have access to these items) but instead is a "challenge [to] whether CCJ can establish reasonable regulations governing the flow of thousands of pieces of mail to thousands of detainees, many of whom may wish to misuse seemingly innocuous materials in order to injure other detainees." *Id*. Defendants also point out that they have agreed to make *Prison Legal News* available to detainees in the law library and recreational areas—a concession they argue "strongly call[s] into question the need for a preliminary injunction" and renders plaintiff's complaint moot. *Id*.

Plaintiff's reply memorandum argues that any recent changes to CCJ's mail procedures policy have been instituted pursuant to oral changes that have not been reduced to writing, and that, contrary to defendants' assertions in their response, *Prison Legal News* has not been made available in common areas or law libraries. Dkt. 35 at 2. Specifically, plaintiff points to the deposition testimony of Daniel Korso, Deputy Chief of Staff at the Cook County Department of Corrections, and his explanation of the September 2016 oral directive:

> Q: Can you explain the contents of the oral directive about inmate monthly periodical subscriptions that took effect in September of 2016?
>
> A: Sure. Cook County Department of Corrections are [sic] now allowing monthly subscriptions to periodicals, so long as the majority or substantial portion of that periodical has to do with legal, criminal justice or prison-related information. Assuming that it does, and it is on a pre-approved – or it is pre-approved by our Executive Director, inmates are as stated allowed to subscribe and receive the subscription.
> ----------
> Q: Do you know which monthly periodicals inmates have been receiving copies of under the September oral directive?
>
> A: Yes.
>
> Q: Which ones?

A:  One of which I know of, which is *Prison Legal News*.

Q:  Are you aware of any others?

A:  I am not.
----------
Q:  And the oral directive that you have been describing, am I correct that the jail intends to reduce that to a formal written policy such as a general order?
----------
A:  At some point, yes.
----------
Q:  So the criteria of [sic] pertaining to legal issues or prison issues, is that criteria documented anywhere?

A.  No.

Q:  Okay.  So that has only been communicated to staff orally, is that correct?

A.  To my knowledge, yes.
----------
Q.  The oral directive that we were talking about that applies at least to [*Prison Legal News*] as of September, 2016 is different from the policy for newspapers where newspapers are kept only in certain locations and not in cells, is that correct?

A.  Yes.
----------
Q.  And do you know which newspapers the jail subscribes to?

A.  *USA Today*.

Q.  Are there any others?

A.  Not to my knowledge.
----------
Q.  Okay.  And am I correct that at no time has Cook County Jail made *Prison Legal News* available to inmates in any common areas through a subscription maintained by Cook County Jail?

A.  Not to my knowledge.

Dkt. 35, Exh. C., at 20-40.  Based on this testimony, plaintiff argues that the 2016 oral directive appears to have been implemented specifically in response to this lawsuit, that it is insufficiently explained and identified, and that it does not cure the unconstitutionality of defendants' current mailroom policy.

## II.    Preliminary Legal Issues

The parties have raised two issues that require attention before the court can turn to the First Amendment and due process claims:  mootness and estoppel.  The court addresses each in turn.

### A.    Mootness

Defendants assert that plaintiff's cause of action is moot because they have made *Prison Legal News* available in CCJ law libraries and recreational areas.  In response, and as noted above, plaintiff highlights the testimony of Daniel Korso indicating that *Prison Legal News* has not been made available in libraries and common areas (although the possibility exists, based again on Mr. Korso's testimony, that it is available by inmate subscription).  Plaintiff also focuses on the fact that defendants have not reduced the oral directive to writing, suggesting that defendants' actions are intended only as a response to this lawsuit and do not effectively moot the cause of action.  The court accordingly examines the issue of defendants' alleged cessation of conduct and the effect of any cessation upon plaintiff's request for a preliminary injunction.

It is well-established that a court's power to grant injunctive relief "only survives if such relief actually is needed."  *Nelson v. Miller,* 570 F.3d 868, 882 (7th Cir. 2009).  Injunctive relief is mooted when "there is no reasonable expectation that the wrong will be repeated."  *Milwaukee Police Ass'n v. Jones,* 192 F.3d 742, 747 (7th Cir. 1999) (internal quotation marks omitted).  Voluntary cessation of conduct does not usually moot a claim for injunctive relief.  *Lipton v. Chattem, Inc.*, 289 F.R.D. 456, 461 (N.D. Ill. 2013); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.,* 528 U.S. 167, 189 (2000) (a defendant's voluntary cessation of a challenged practice does not necessarily moot a case); *Vincent v. City Colleges of Chicago,* 485 F.3d 919, 925 (7th Cir. 2007) ("[v]oluntary cessation of unlawful activity does not moot every

request for prospective relief") (citations omitted).  To truly establish that a case is moot, and therefore subject to dismissal as a matter of right, a defendant must overcome a heavy burden.  The defendant must show "that it is absolutely clear that allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth,* 528 U.S. at 190.  This high burden of proof is necessary to prevent a defendant from voluntarily ceasing the offending conduct as a strategic decision to prevent an adverse ruling, only to continue the conduct later, once the coast is clear.  *See Chicago United Indus. Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006).

Defendants in this case have not met this high burden.  Although they contend in their response brief that *Prison Legal News* is available in the libraries and recreation rooms, the deposition testimony of Mr. Korso contradicts this assertion and actually describes something quite different:  that inmate subscriptions of *Prison Legal News* are allowed with pre-approval, but that the only newspaper inmates may receive in the common areas and law libraries remains *USA Today*.  The court is struck by the inconsistent nature of defendants' assertions, and also by defendants' failure to formally memorialize the very policy changes they now want the court to accept as true.  The court cannot ascertain the exact terms of any 2016 mailroom policy changes and therefore cannot conclude that it is "absolutely clear" the allegedly wrongful behavior will not reoccur.  The matter before the court is not moot.

### B.      Estoppel

Plaintiff argues that defendants are estopped from litigating the constitutionality of their ban on newspapers.  In support of this argument, plaintiff points to *Koger v. Dart*, 114 F. Supp. 3d 572, 584 (N.D. Ill. 2015).  In *Koger*, a CCJ inmate sued Cook County and Sheriff Thomas Dart, alleging that the jail's absolute ban on newspapers was unconstitutional under the First Amendment.  The court agreed, finding that although the absolute ban on newspapers was

rationally related to jail security, a complete ban was an exaggerated response to the jail's security concerns, and that there existed "obvious, easy alternatives to an outright ban." *Id*. at 584. For instance, the jail could decide to purchase only national or international newspapers, which would be less likely to contain information about local gang activity, or the jail could review each incoming issue for content problems. *Id*. at 583.

Plaintiff's argument that CCJ should be "collaterally estopped from re-litigating the constitutionality" of the ban on newspapers because of *Koger* is misplaced. The *Koger* court specifically noted that the question before it was the constitutionality of a total ban on newspapers. It was not asked to resolve inmates' "right to subscribe to newspapers or read a broad variety of newspapers." *Koger*, 114 F. Supp. 3d at 583 n. 3. CCJ's current newspaper policy allows *USA Today* in the common areas, and this result is in keeping with *Koger's* proscription against a complete newspaper ban.[4] Perhaps what plaintiff is trying to argue is that it finds defendants' current one-newspaper policy too restrictive—but this is a separate argument from the one it is making: that defendants are collaterally estopped from relitigating the constitutionality of a newspaper print ban. Plaintiff paints with too broad a brush. This argument is rejected.

## III.    Preliminary Injunction

The court turns now to plaintiff's request for a preliminary injunction. A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 22 (2008). To determine whether a particular circumstance justifies the remedy of a preliminary injunction,

---

[4] According to the declaration of Daniel Korso, 60 copies of *USA Today* are delivered to CCJ daily, Monday through Friday, and are then dispersed to recreational areas. Korso Aff., Dkt. 25, Exh. 1. The only exception to this is in the maximum security facility, in which case the newspapers are accessible to inmates in the law library. *Id.*

the court must analyze the facts of the case in two distinct phases: a threshold phase and a balancing phase. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of America, Inc*., 549 F.3d 1079, 1086 (7th Cir. 2008). In the threshold phase, the moving party must satisfy each of three requirements: "First, that absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims." *Id.* "Second, that traditional legal remedies would be inadequate." *Id.* "And third, that its claim has some likelihood of succeeding on the merits." *Id.* If the court determines that the moving party has failed to demonstrate any one of these three threshold requirements, it must deny the injunction. *Id*. (citations omitted); *see also Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992). Only once the moving party has passed this initial threshold analysis does the court then proceed to the balancing phase of the analysis. *Girl Scouts*, 549 F.3d at 1086.

In First Amendment cases, special attention is given to the first factor—the likelihood of success on the merits—because in these cases, the likelihood of success on the merits will often be the determining factor. *See American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012). This is so because the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion). Further, the "quantification of injury is difficult and damages are therefore not an adequate remedy." *Flower Cab Co. v. Petitte,* 685 F.2d 192, 195 (7th Cir. 1982). Moreover, if the plaintiff is able to establish a likelihood of success on the merits, the balance of harms normally tips in favor of granting preliminary injunctive relief because "injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker,* 453 F.3d 853, 859 (7th Cir. 2006).

**A.     Reasonable Likelihood of Success on the Merits:  First Amendment Claim**

To determine the likelihood of plaintiff's success on the merits, the court first analyzes plaintiff's claim that defendants' ban on inmates receiving subscriptions to magazines or periodical publications directly from the publisher, and its ban on newspapers other than *USA Today*, violates its First Amendment rights.  The Seventh Circuit has held that prisoners generally have a constitutionally-protected interest in their incoming and outgoing mail correspondence.  *See Kaufman v. McCaughtry,* 419 F.3d 678, 685 (7th Cir. 2005) (citing *Rowe v. Shake,* 196 F.3d 778, 782 (7th Cir. 1999) (citations omitted)).  This right also applies to persons outside the prison who have an interest in corresponding with prison inmates.  *See Thornburgh v. Abbott,* 490 U.S. 401, 408 (1989) (reaffirming that "publishers who wish to communicate with those who, through subscription, willingly seek their point of view have a legitimate First Amendment interest in access to prisoners"); *Rowe v. Shake*, 196 F.3d 778, 783 (7th Cir. 1999) (finding that non-prisoners have a First Amendment right to correspond with prisoners, and that "the government's unjustifiable interference with correspondence violates the First Amendment rights of both the recipient and the sender").  Accordingly, the court finds that plaintiff in this case has a First Amendment interest in sending correspondence to prison inmates at CCJ.

That being said, prison officials may impose restrictions on prisoner correspondence that are "reasonably related to legitimate penological interests."  *Turner v. Safley,* 482 U.S. 78, 89 (1987).  Such legitimate penological interests might include crime deterrence, prisoner rehabilitation, and protecting the safety of prison guards and inmates.  *See Singer v. Raemisch,* 593 F.3d 529 (7th Cir. 2010) (affirming summary judgment in favor of prison officials who restricted role-playing game that mimicked the organization of gangs); *May v. Libby,* 256 Fed. Appx. 825 (7th Cir. 2007) (affirming grant of judgment as a matter of law for prison officials

who confiscated inmate's internal grievance form against the prison because it was not unreasonable to perceive letter as a threat).  In *Turner,* the Supreme Court set forth four factors that courts may weigh in assessing the validity of a prison's regulation:  (1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) whether the inmates have access to "alternative means" of exercising the restricted right; (3) the "impact [an] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether the regulation is an "exaggerated response to prison concerns."  *Turner,* 482 U.S. at 89–91 (internal citations omitted).  The burden of persuasion is on the plaintiff to disprove the validity of a regulation, *Overton v. Bazzetta,* 539 U.S. 126, 132 (2003) (citations omitted), although defendants must still articulate their legitimate governmental interest in the regulation.  *Turner,* 482 U.S. at 89.  For their part, courts are to accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them."  *Overton,* 539 U.S. at 132 .

### 1.  Rational Relationship to Legitimate Penological Interests

The first *Turner* factor requires "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it."  *Turner,* 482 U.S. at 89 (citations omitted).  Defendants note that CCJ's current mailroom policy is not a blanket ban.  Instead, the current policy allows detainees to receive three soft cover books or 10 newspaper clippings per mailing.  Plus, *USA Today* is allowed in common areas and/or the law library.  Detainees may receive magazines and periodicals from persons outside the correctional facility, although not directly from the publisher.  All mail to detainees is subject to scrutiny and anything

deemed unacceptable based on security concerns or inappropriate content (as determined by CCJ) may be rejected, at which time the inmate and sender will receive notification of the rejection.[5] The mailroom policy also limits the number of books a detainee may keep in his cell. Dkt. 25, at 12-13; Dkt. 35, Exhs. A, B. Defendants provide a number of rationales for these restrictions: (1) newspapers and books are highly flammable and can be used to start fires; (2) they can cause sanitation problems (inmates can use them to clog toilets); (3) they can be used to hide weapons and contraband, including drugs; (4) they can be used to send coded messages; and (5) they can be used to cover windows of cells, thus obscuring the guards' ability to monitor the inmates. Defendants also note that allowing inmates to possess large quantities of items, such as books, can lead to theft and disputes regarding property. Dkt. 25, at 11.

At this preliminary stage of this case, the court finds that the reasons offered by defendants are, at least on their face, rationally related to prison security. *See Koger*, 114 F. Supp. 3d at 580 (finding each of defendants' asserted rationales to be rationally related to prison security, including that newspapers are flammable and can cause sanitation problems); *Overton*, 539 U.S. at 133 (rationales tied to maintaining jail security are legitimate penological goals). Although plaintiff contests the validity of these assertions by arguing that "the materials at issue present no legitimate security threat to the Jail and should not be selectively censored because it [sic] is published on newsprint," Pl.'s Mem., Dkt. 7, at 6, this is a conclusory statement that does little to illuminate how the concerns are ill-founded.

---

[5] General Order No. 14.10, III(H)(2)-(3) specifically provides that "[r]eturned mail and packages will be stamped (return to sender) and documented in the 'Mail Return' logbook . . . . The 'Mail Return' logbook is separate from the other logbooks maintained by the mailroom. After logging the information, the mailroom employee will notify the inmate of the returned mail by sending a 'Notice of Mail Return' form with the regularly scheduled mail deliveries." The court finds it perplexing that neither party specifically references or discusses this mailroom return policy and the procedures mentioned therein. *See* Dkt. 35, Exh. A.

That being said, further inquiry and discovery may shed new light on these rationales. For instance, the court questions defendants' rationale that allowing plaintiff's publications into CCJ would increase safety and sanitations concerns. In *Koger*, the court observed that "because the jail already limits inmate possessions to a property box, allowing newspapers would not increase the amount of such material in circulation."[6] *Koger*, 114 F. Supp. 3d at 582. Neither party in this case discusses the existence of property boxes at CCJ, but the court finds it unlikely that the jail has gotten rid of them since July 2015, when the *Koger* decision was issued. Accordingly, and assuming the property boxes are still issued to CCJ inmates, defendants' argument that allowing additional newspapers into the jail creates the likelihood of sanitation and security concerns seems somewhat specious and creates the impression that a ban on plaintiff's products is perhaps a content restriction—which would be highly suspect under the First Amendment. But in view of the parties' failure to discuss property boxes or even to demonstrate the accuracy of Daniel Korso's testimony that inmates are receiving plaintiff's products, the court at this point finds that the first *Turner* factor weighs in favor of defendants.

## 2. Availability of Alternative Avenues for Exercise of Asserted Speech

The second *Turner* factor questions whether "other avenues remain available for the exercise of the asserted right." *Turner*, 482 U.S. at 90 (citations omitted). Alternative means need not be ideal; rather, they need only be available. *Overton,* 539 U.S. at 127.

Defendants argue that inmates have a number of other avenues to exercise their right to speech; for instance, *USA Today* is available in the common areas. Further, inmates have access

---

[6] The *Koger* court noted that CCJ "imposes a strict limit on how much property an inmate may possess at any given time" by issuing each inmate a property box measuring 21 inches long, 8.5 inches deep, and 15.5 inches wide. *Koger,* 114 F. Supp. 3d at 576. Inmates were allowed to possess "paper bags, notepaper, drawing pads, books, and magazines (including magazines made from the same material as newspapers), envelopes, legal materials, greeting cards, playing cards, religious texts, letters and photos sent from outside the jail, toilet paper, extra undergarments, and bedding,"—provided these possessions fit within the contours of the box. *Id.* The *Koger* court considered very relevant the existence of the property box and failed to see how allowing newspapers at CCJ would increase the amount of materials circulating around the jail. *Id.* at 581-82.

to television and can check out up to two books from the public library.  *See* Affidavit of John

Mueller, Dkt. 25, Exh. 3.  However, whether the *inmates* have other alternative avenues of free

speech is not the issue before the court.  Rather, the question here is whether *plaintiff* has other

avenues to exercise its First Amendment right to correspond with inmates.  And the answer is no.

The only viable means of communication between plaintiff and the inmate population is through

plaintiff's publications.  Plaintiff cannot be expected to communicate via telephone, email, or in

person.  As plaintiff has no other viable way to communicate with inmates other than through the

mail, this *Turner* factor weighs in plaintiff's favor.[7]

### 3. Impact of Communication on Guards, Prisoners, and the Allocation of Prison Resources

The third *Turner* factor evaluates "the impact accommodation of the asserted

constitutional right will have on guards and other inmates, and on the allocation of prison

resources generally."  *Turner*, 482 U.S. at 90.  "This third factor weighs most heavily when

accommodation of an asserted right will have a significant ripple effect on fellow inmates or

prison staff."  *Prison Legal News v. County of San Diego*, No. 14-cv-05304 JRC, 2014 U.S. Dist.

LEXIS 126856, *22 (W.D. Wa. Sept. 10, 2014) (internal citations omitted).

Defendants argue that accommodating plaintiff's demand to allow its publications at CCJ

"would dramatically impact the work of  CCJ staff, and increase dangers for CCJ staff and other

inmates."  Dkt. 25 at 13.  Defendants point out that a limitation on the quantity of reading

materials is directly related to security concerns, as well as aimed at limiting the burden on

prison staff.  For instance, allowing personal subscriptions to magazines and other publications

could "exponentially" increase the volume of paper in the mailroom and burden the staff, whose

---

[7] As noted above in the discussion regarding mootness, defendants' failure to memorialize its new policy regarding *Prison Legal News* at CCJ, as well as the contradictory evidence they present in their response brief, leaves this court unable —for purposes of the second *Turner* factor—to consider the likelihood that the publication may well be available at CCJ.

job it is to maintain a secure, sanitary, and functional jail environment.  *Id.* at 14.  Defendants

offer the Affidavit of Daniel Moreci, First Assistant Executive Director at the Cook County

Department of Corrections, who states that on any given day, over 1,000 pieces of mail arrive at

CCJ, and each piece is subjected to a dog sniff search and a staff search that involves going

through each page of books, magazines, and letters to inspect for contraband.  *Id.,* Exh. 2.

Plaintiff responds to these assertions by noting that since 1990, *Prison Legal News* has

been delivered to hundreds of thousands of prisoners nationwide, and that it is unaware of any

security threats that have been created by the delivery of the publications.  Plaintiff offers the

declaration of Paul Wright, the founder and editor of *Prison Legal News*, who asserts that he has

never heard of his publications ever interfering with a correctional facility's penological

interests.  Dkt. 7, Exh. A, at 4-5.

In *Koger*, the CCJ raised arguments similar to those proffered by defendants in this case:

for instance, the dangers posed by the flammability of newspapers and the ability of inmates to

fashion newspapers into weapons.  *Koger*, 114 F. Supp. 3d at 580.  However, while the court

agreed that these were legitimate concerns, it also found that allowing newspaper into the jail

would have "a *de minimis* impact" on the jail's security concerns.  *Id*. at 582.  Prisoners already

were limited as to the quantity of paper products allowed in their cells to the size of a storage box

intended for these possessions.  When the box is full, the prisoner is not allowed anything more.

*Id*.  But the court also noted that the potential impact of problems associated with waste disposal

and inmate violence was unclear, and so it deferred on these points to the prison officials.  *Id*. at

583.  Ultimately, the court ruled that this *Turner* factor favored the plaintiff.

In this case, the court reluctantly concludes that the third *Turner* factor weighs in

defendants' favor.  The burden of persuasion is on plaintiff to disprove the validity of a

regulation. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted). Courts are to accord "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Id.* at 132. Defendants have offered reasons for limiting the influx of mail into CCJ that the court finds facially legitimate. However, the court recognizes the potential validity of plaintiff's contention that "correctional facilities often use restrictive mail policies as a pretext to keep out publications and correspondence that administrators do not want to distribute to prisoners." Decl. of Paul Wright, Dkt. 7, Exh. A, at 5. The court already has discussed the property boxes and how their use to limit inmate possessions potentially undercuts defendants' contention that plaintiff's publications would overwhelm the mailroom and stress the guards and other employees. This certainly is something to explore through discovery. At this point in the litigation, however, plaintiff has not met its burden of persuasion in disproving the validity of the regulations.[8]

### 4. Existence of Easy and Obvious Alternatives

The fourth *Turner* factor requires this court to examine "whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." *Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001). This factor need not require the adoption of the least restrictive alternative; however, courts may consider "an alternative that fully accommodates the [asserted] rights at *de minimis* cost to valid penological

---

[8] Footnote 1 of plaintiff's memorandum states that when the plaintiff presents evidence that refutes a "'common-sense connection' between a legitimate objective and a prison policy, the defendant 'must present enough counter-evidence to show that the connection is not so remote as to render the policy arbitrary or irrational.'" Dkt. 7 at 5 n.1 The court takes note of the line of cases holding that prison administrators cannot avoid judicial scrutiny by providing "reflexive, rote assertions," *Shimer v. Washington*, 100 F.3d 506, 509 (7th Cir. 1996), but finds that plaintiff has not come forward at this juncture with sufficient specific evidence or argument requiring defendant to then provide counter-evidence. Plaintiff's briefing suffers from conclusory statements that do not go the extra mile to connect claims with specific policy and procedure.

interests as evidence that the policy unreasonably infringes upon First Amendment rights." *Turner*, 482 U.S. at 91.

On this point, plaintiff states that "[t]he fact that more than 2,600 correctional facilities nationwide accept PLN's publication each month strongly suggests that the Defendants' censorship is an exaggerated response." Dkt. 7 at 9. Defendants respond that newspapers are allowed in common areas (actually, just one newspaper—*USA Today*). Further, defendants argue that its mailroom policy is not an exaggerated response but is a legitimate policy aimed at mitigating CCJ's need to manage safety and sanitation concerns by limiting the amount of paper and reading materials inmates may keep in their cells.

The court notes once again that defendants seek to use the alleged availability of *Prison Legal News* at CCJ as an argument in their favor, yet the exact nature of defendants' action in this regard is unclear due to the conflicting evidence presented on this point and by the fact that the directive to allow *Prison Legal News* at CCJ remains an oral one. However, the fact that defendants have indicated a willingness to provide *Prison Legal News* in some capacity at the jail indicates the existence of an easy and obvious alternative to any prior refusal to make this publication available. The court also finds persuasive the fact that *Prison Legal News* is widely available in penal institutions across the country–a point defendants do not contest. Clearly, many other institutions have found a way to integrate *Prison Legal News* into their facilities. The court thus finds that an easy and obvious alternative exists to an outright ban on plaintiff's publications in the form of placement of the newspaper and handbook in common rooms and law libraries. *See Koger*, 114 F. Supp. 3d at 584 (finding a reasonable alternative would be permitting newspapers in libraries and day room, but not individual cells). Alternatively, if it is true, as Daniel Korso testified, that *Prison Legal News* is allowed to be received directly by

inmates who have subscriptions, and that this is consistent with CCJ's rules about the volume of paper inmates are allowed to keep in their cells, then a different, easy alternative to the "censorship" of *Prison Legal News* is obvious and available. Defendants basically have admitted as much. The fourth *Turner* factor weighs in plaintiff's favor.

In sum, the court's reasoning reveals that two of the *Turner* factors favor plaintiff, and two factors favor defendants. This leaves the court to consider whether two out of four factors equate with a "reasonable likelihood of success on the merits." In this *particular* case, the court thinks not. The burden of persuasion is on plaintiff to disprove the validity of a regulation, but plaintiff has not taken much time to analyze and discuss the specific mailroom regulations, or provide details regarding the process underlying its own mailings to CCJ, or even provide information regarding how it knows that its publications have been rejected. Furthermore, plaintiff does not reject defendants' allegations that they are delivering *Prison Legal News* in some capacity to CCJ. Admittedly the record on this point is confusing, but what stands out to the court is the uncontested assertion that plaintiff's publication is somehow being made available to CCJ inmates. Finally, the court takes stock of the Third Circuit's comments in *DeHart v. Horn*, 227 F.3d 47, 59 (3d Cir. 2000), where it noted that "*Turner* does contemplate a judgment by the court regarding the reasonableness of the defendant's conduct under all of the circumstances reflected in the record," but it "does not call for placing each factor in one of two columns and tallying a numerical result." Indeed, in that case, the appellate court was faced with a similar situation involving a division of *Turner* factors between the parties, and it resolved the matter by remanding the case back to the district court to allow the parties to more fully develop the record and inquire more deeply into relevant issues. *Id*. at 59-60. This court feels similarly—that the parties need to more fully develop the record and inquire more deeply into

the issues underlying defendants' mailroom policies and procedures, and the actual status of *Prison Legal News* at CCJ, before the court can reasonably resolve the First Amendment issues presented here.

**B.**      **Reasonable Likelihood of Success on the Merits:  Due Process Claim**

Plaintiff also claims that it has a due process right to have "[a]n opportunity to be heard" in order to "challenge censorship decisions based on the rationales employed at the time of the censorship, as well as a chance to assist subscribers in filing challenges to such violations within the correctional grievance system."  Dkt. 7, at 10.  Plaintiff also claims that defendants did not provide notice when they intercepted plaintiff's various publications.  *Id.* at 11.  Defendants reject plaintiff's suggestion that the media has a due process right to a notice when mail is withheld.  Even so, defendants claim that it has a "policy and practice . . . to provide written notifications to individual inmates and senders when mailings and/or their contents are confiscated or withheld."  Dkt. 25 at 16.  Defendants further contend that while plaintiff alleges that it has not received any notification from them, plaintiff in turn has not provided them with "any identifiers of particular inmate recipients or mailings that are at issue in this case."  *Id*.

It is well established that "[t]he fundamental requisite of due process of law is the opportunity to be heard."  *Grannis v. Ordean,* 234 U.S. 385, 394 (1914).  In the context of prison correspondence, the Supreme Court held in *Procunier v. Martinez,* 416 U.S. 396, 417-18 (1974), *overruled on other grounds by Thornburg v. Abbott*, 490 U.S. 401 (1989), that "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards.  The interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a 'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of necessity by the circumstance of

imprisonment." The Court in *Procunier* agreed with the minimal procedural safeguards identified by the lower court, including: (1) notifying the intended recipient-inmate; (2) giving the author of the publication a reasonable opportunity to protest the decision; and (3) referring complaints about the decision to a prison official other than the person who originally disapproved the correspondence. *Id.* at 418–19. Following *Procunier*, numerous circuits have held that publishers have due process rights when a prison rejects their publications. *See, e.g., Jacklovich v. Simmons,* 392 F.3d 420, 433 (10th Cir. 2004); *Prison Legal News v. Cook ,* 238 F.3d 1145, 1152-53 (9th Cir. 2001); *Montcalm Publishing Co. v. Beck,* 80 F.3d 105, 109 (4th Cir. 1996); *Martin v. Kelley,* 803 F.2d 236, 243-44 (6th Cir. 1986).

In this case, the court is handicapped by the parties' incomplete briefing. Both parties devote only a single page of their respective briefs to the topic of due process. Plaintiff hardly elaborates upon specific aspects of defendants' mailroom policy or practice that it finds objectionable, and provides no specific details regarding the rejection/censorship of its publications in this case. Defendants likewise do not refer in any great detail to their rejection and notification policies and procedures or provide any detailed information about what happens when a piece of mail is rejected, either generally or specifically in this case. Defendants have not discussed their Mail Return logbook, for instance, which the court finds troublesome. *See* footnote 5, *infra*.

Despite the thinness of the parties' arguments, the court nevertheless is persuaded that plaintiff has demonstrated a reasonable likelihood of success on the merits of its due process claim. Legal precedent supports plaintiff's right to receive some basic form of notification upon defendants' rejection of its publications. What such a notification must look like is not before the court, but certainly it allows plaintiff to know that its material was rejected and the reason for

the rejection. The facts in this case suggest a likelihood that plaintiff received no notification of any kind, and defendants do not persuade the court otherwise.

### C. Irreparable Harm/Adequate Monetary Relief

Having analyzed plaintiff's likelihood of success on the merits of its First Amendment and due process claims, the court looks next to whether plaintiff will suffer irreparable harm if preliminary relief is denied, and whether there exists an adequate remedy at law. The court is mindful of established caselaw stating that the loss of First Amendment freedoms, even for very limited periods of time, constitutes irreparable injury that is difficult to quantify and thus legal damages are an inadequate remedy. *See Elrod,* 427 U.S. at 373. However, as previously discussed, plaintiff has not fully convinced the court, at this juncture anyway, that its First Amendment claims will prevail.

Additionally, plaintiff's main argument related to irreparability—that *Prison Legal News* must be delivered to detainees quickly, lest the news become stale or irrelevant—is severely undermined by the fact that plaintiff waited over a year to file its complaint following the first alleged instance of censorship. As defendants point out, plaintiff's motion for a preliminary injunction was filed on July 1, 2016, yet plaintiff alleges that defendants have been engaging in impermissible censorship since March 2015. Delays in pursuing an injunction are highly relevant to the claim of irreparable harm. *See, e.g.,Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will suffer irreparable harm if a preliminary injunction is not entered."); *Preston v. Bd. of Trustees of Chicago State Univ.*, 120 F. Supp. 3d 801, 806 (N.D. Ill. 2015) (plaintiff's unexplained 17-month delay in pursuing a preliminary injunction regarding his alleged loss of First Amendment freedoms undermined the severity of these purported harms);

*Tarvin v. Bd. of Educ.,* No. 09–655-GPM, 2010 WL 1444862, at *2 (S.D. Ill. Apr. 9, 2010) ("[T]he fact that Plaintiffs waited over three months to file their Motion for Preliminary Injunction, belies their argument that they were suffering the loss of First Amendment freedoms.").

Plaintiff's unexplained 15-month delay in seeking a preliminary injunction is troublesome given plaintiff's request for immediacy from this court. Perhaps the explanation for the delay lies in the fact that plaintiff waited a few months to see whether CCJ's rejection of its publications would be an ongoing problem. Perhaps the explanation lies in the fact that plaintiff is a small organization with limited staff. Plaintiff does not say. Yet the declaration of Paul Wright, founder and editor of *Prison Legal News*, states that "since publication began twenty-five years ago, I have carefully monitored all instances in which a jail or prison refused to deliver mail from Prison Legal News." Dkt. 7, Exh. A. Taking this statement as true, Mr. Wright actively monitors the delivery of *Prison Legal News* in penal institutions across the country and thus by his own admission should have been well aware that *Prison Legal News* was being "censored" by CCJ for over a year prior to the filing of plaintiff's motion. The unexplained fact that plaintiff waited so long to file its preliminary injunction motion cuts against the claim that it will suffer irreparable injury in the absence of a preliminary injunction.

The Seventh Circuit made clear in *Goodman v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 438 (7th Cir. 2005) that "[i]n order to prevail in a First Amendment case, the plaintiff must first show that protected speech is being restricted." The plaintiff has not made this showing. The plaintiff has raised legitimate concerns regarding the manner in which defendants treat plaintiff's publications, but even after highlighting the weaknesses of defendants' proffered rationales regarding its current mailroom policy, and giving plaintiff the

benefit of doubt, the fact remains that plaintiff has not satisfied the threshold determinations needed for the granting of a preliminary injunction. The court simply cannot be certain at this juncture that protected speech is being restricted. Figuring out exactly what is happening at CCJ with respect to *Prison Legal News* and the *Prisoner's Handbook* should be a high priority in discovery. But in the final analysis, a preliminary injunction is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief. The court cannot grant this extraordinary relief on such an indeterminate factual record.

## IV.    CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction [6] is denied.


Date:   November 21, 2016

_____/s/_____
Joan B. Gottschall
United States District Judge